IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RONNIE JOE WILLIAMS, JR.,

        Plaintiff,

v.                                                             Civil Action No. 3:14-CV-24

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## **REPORT AND RECOMMENDATION**

## **I. INTRODUCTION**

### **A. Background**

On February 24, 2014, Ronnie Joe Williams ("Plaintiff") filed this action under 42 U.S.C. §§ 405(g) for judicial review of an adverse decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and social security income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433.[1] The Commissioner filed her answer on June 26, 2014.[2] The Plaintiff then filed his motion for summary judgement on August 8, 2014,[3] and the Commissioner filed her motion for summary judgement on September 4, 2014.[4] The Plaintiff filed a reply to the Commissioner's motion on September 18, 2014.[5] The motions are now ripe for the Court's review, and for this report and recommendation.

---

[1] ECF No. 1.

[2] ECF No. 8.

[3] ECF No. 14.

[4] ECF No. 16.

[5] ECF No. 18.

**B. The Pleadings**

1. The Plaintiff's Motion for Summary Judgment and Memorandum in Support.

2. The Commissioner's Motion for Summary Judgment and Memorandum in Support.

**C. Recommendation**

I recommend that:

1. The Plaintiff's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's (1) finding that the Plaintiff's alleged voice loss is a nonsevere impairment and (2) RFC in limiting the Plaintiff to work consisting "primarily of gross manipulation."

2. The Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

**A. Procedural History**

The Plaintiff applied for DIB and SSI on February 23, 2011, alleging a disability beginning on February 22, 2011. R. 155-72. The Plaintiff's claims were initially denied on April 15, 2011, and upon reconsideration on August 12, 2011. R. 96-105, 108-113. On September 12, 2011, the Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 114-15. An ALJ hearing was held on August 17, 2012, before ALJ Karl Alexander. R. 71. The Plaintiff, who was represented by counsel, testified at the hearing, as did a vocational expert ("VE"). R. 73-91. On August 31, 2012, the ALJ found that the Plaintiff had not been under a disability from December 8, 2009, through the date of the ALJ's decision. R. 55-67. The Plaintiff appealed the ALJ's decision to the Appeals

Council, which denied review on November 21, 2013. R. 4-7. The Plaintiff then timely brought his claim to this Court.

**B. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that the Plaintiff was not under a disability during the period at issue.

On January 3, 2011, the Plaintiff was admitted to the emergency room at Summersville Reginal Medical Center and diagnosed with acute bronchitis and questionable pneumonia. R. 287. On January 6, 2011, during an examination by Milissa Short, RNFNP, the Plaintiff stated he felt better and continued to work. *Id.* However, the Plaintiff told Ms. Short that he is a welder and has had more difficulty getting air into his lungs. *Id.* On a follow-up examination, the Plaintiff reiterated that he was not getting enough air, "especially on days he is welding." R. 285. Ms. Short later concluded that the Plaintiff had restrictive airway disease. *Id.*

On February 16, 2014, the Plaintiff was examined by Mark Byrd, MD. R. 274-76. Dr. Byrd found "[n]o visible respiratory effort" and that the Plaintiff's "[b]reath sounds normal." R. 274. Dr. Byrd assessed that the Plaintiff's "severe restrictive ventilatory impairment" was recorded on a recent pulmonary function test. R. 275. However, a CT of the Plaintiff's chest was "unremarkable." *Id.* Dr. Byrd noted that the Plaintiff is "very dyspneic and unfortunately has a significant occupational exposure while welding." *Id.* Further, according to Dr. Byrd, the Plaintiff "has no obvious thoracic cage abnormality," "no obvious structural pathology on [chest CT]," and no neuromuscular impairment. *Id.*

On March 23, 2011, Fulvio Franyutti, MD, a state medical consultant, concluded that the Plaintiff could perform light work. R. 300-07. In August 2011, "C. Bancoff" reviewed and affirmed

3

Dr. Franyutt's assessment as written. R. 401.

On April 22, 2011, the Plaintiff was evaluated by Allison Cihla, MD, due to the Plaintiff's shortness of breath. R. 310. During this evaluation, the Plaintiff stated that his symptoms began "in January [2011] with laryngitis, cough and shortness of breath. . . . Since that time, the cough and laryngitis have resolved, but he continues to have shortness of breath." *Id.* The Plaintiff contends that he cannot take a full breath and can only walk briefly before experiencing shortness of breath. *Id.* The Plaintiff told Dr. Cihla that he has stopped working. *Id.* Dr. Cihla assessed that the Plaintiff has "[s]evere restrictive lung disease, with significant bronchodilator response" and "[d]iaphragmatic or neuromuscular weakness, as evidenced by the FCV and airway pressure measurements." R. 312.

On May 4, 2011, the Plaintiff underwent a fluoroscopic sniff test. R. 313. Nick Alan Treadwell, MD, found "[n]o evidence of paradoxical movement of the diaphragmatic leaflets with excusrsion . . . ." *Id.*

On May 6, 2011, the Plaintiff was again evaluated by Dr. Cihla. R. 308. The Plaintiff complained of "tremors and weakness in his left hand" and "shortness of breath." *Id.* However, the Plaintiff stated, "that since his last visit [on April 22, 2011] his breathing has been stable." *Id.* Dr. Cihla assessed that the Plaintiff suffered from "[d]yspnea with evidence of severe obstructive ventilatory defect," "history of viral illness," "obstructive sleep apnea," and "left upper extremity weakness and tremors . . . ." R. 309.

On May 11, 2011, the Plaintiff was examined by Dr. Byrd. R. 317. Dr. Byrd noted the Plaintiff's respiratory symptoms as "[u]sual dyspnea on exertion," however, the Plaintiff was experiencing "[n]o cough." *Id.*

4

After a sleep study conducted on May 16, 2011, the Plaintiff was diagnosed with obstructive sleep apnea by Charles E. Porterfield, DO. R. 419-24.

On May 20, 2011, the Plaintiff was evaluated by Ms. Short. R. 341. The Plaintiff reported that his left arm was increasingly shaking. *Id.* During an examination, Ms. Short noted that the Plaintiff "did continue to have tremors of his hands with finger to nose exercise." *Id.* During another evaluation on June 3, 2011, the Plaintiff stated that "inderal is helping his tremors quite a bit." R. 339. During this evaluation, the Plaintiff also denied "any increased shortness of breath or ineffective [nebulizer] treatments." *Id.*

On June 14, 2011, the Plaintiff had an x-ray taken of his right elbow. R. 325. The x-ray revealed "small spur formations at the olecranon process of the ulna and at the lateral epicondyle of the humerus." *Id.* Otherwise, the x-ray revealed "no other significant bony abnormalities." *Id.*

On July 15, 2014, during another evaluation with Ms. Short, the Plaintiff reported that "his tremors are better unless he works his arms like weed eating" or similar activities. R. 365. Ms. Short reported that the Plaintiff has a "limited range of motion in his arms" and "[w]hen his elbows are in complete extension he does experience tremors and . . . pain and discomfort." *Id.*

On August 8, 2011, the Plaintiff visited the West Virginia University Orthopaedic Hand Surgery Clinic for an evaluation of bilateral elbow pain and stiffness. R. 358. Joseph Prudhomme, MD, evaluated the Plaintiff. R. 358-59. During the physical examination, Dr. Prudhomme found that the Plaintiff did "not appear to be out of breath" and his breathing was "nonlabored." R. 358. Dr. Prudhomme did find that the Plaintiff has "an intention tremor with bilateral upper extremities . . . ." R. 359. Dr. Prudhomme concluded that the Plaintiff has a bilateral intention tremor, however, there is "no orthopedic explanation for [the Plaintiff's] symptoms." *Id.* Dr. Prudhomme suggested

that the Plaintiff's tremor is "most likely a neurological problem." *Id.*

Also on August 8, 2011, the Plaintiff was evaluated by Dr. Cihla. R. 378. According to Dr. Cihla, the Plaintiff stated "that since his last visit, his breathing has been stable." *Id.* The Plaintiff also complained of "tremors and weakness in his right hand as well as pain in his elbows . . . ." *Id.* The Plaintiff said that it is "easier" to use a treadmill and bicycle. *Id.*

On August 29, 2011, the Plaintiff underwent an x-ray of his right wrist. The results displayed an "old nonunited avulsion fracture, ulnar styloid process." R. 441. However, "no acute fracture, dislocation or other significant bony abnormalities otherwise at the right wrist." *Id.*

On October 27, 2011, the Plaintiff was again evaluated by Ms. Short. R. 455. The Plaintiff complained of laryngitis and right wrist swelling and tremors. *Id.* During a November 3, 2011, follow-up appointment, the Plaintiff continued to have laryngitis-type symptoms and claims no recent improvement. R. 453. On November 17, 2011, the Plaintiff claimed that his respiratory status had improved. R. 451. On December 5, 2011, the Plaintiff complained of shortness of breath. R. 449.

Ms. Short referred the Plaintiff to rheumatologist Shelly P. Kafka, MD. R. 475. A consultation by Dr. Kafka was performed on January 4, 2012. *Id.* Dr. Kafka diagnosed the Plaintiff with polyarthralgias. R. 479. Dr. Kafka also noted that the Plaintiff's tremors could be the result of "an early neuromuscular disorder." *Id.*

On February 10, 2012, C. Hickman, MD, reported that the Plaintiff underwent "a biopsy of a lesion on his left elbow." R. 494. On March 22, 2012, Dr. Hickman reported that the Plaintiff was complaining of back pain. R. 492. On May 4, 2012, the Plaintiff again was evaluated by Dr. Hickman for a follow-up on the Plaintiff's reported left knee pain. R. 490.

On April 26, 2012, the Plaintiff was again evaluated by Dr. Cihla. R. 504. Dr. Cihla reported

that the Plaintiff's breathing has been stable, but "he continues to complain of pain and warmth in his elbows and knees." *Id.*

On May 29, 2012, the Plaintiff was evaluated by Crystal M. Rodebaugh, MD. R. 487. The Plaintiff complained of laryngitis. *Id.* Dr. Rodebaugh reported the Plaintiff displayed normal breathing and voice sounds, but Dr. Rodebaugh diagnosed the Plaintiff with laryngitis. R. 489.

On June 6, 2012, the Plaintiff was evaluated by Anthony Anfuso, MD. R. 509-11. The Plaintiff complaints of obstructive sleep apnea and "that he has lost his voice 7-8 times in the past year." R. 510. Dr. Anfuso performed a diagnostic flexible laryngoscopy. R. 511.

In July 2011, the Plaintiff was evaluated for wrist pain. R. 535-38. On July 6, 2012, an x-ray of the Plaintiff's right wrist indicated an "old nonunited avulsion fracture" and "right ulnar styloid process." R. 522. A wrist procedure performed on July 27, 2012, indicated the "[d]egenerative change" and possible "scapholunate ligament injury." R. 518.

On July 21, 2012, the Plaintiff underwent a fiberoptic trans-nasal laryngoscopy by Jason P. McChesney, MD. R. 533-34. After the procedure, Dr. McChesney assessed that the Plaintiff had muscle tension dysphonia and hoarseness of voice, possibly from "[i]ncreased muscular tension with phonation, suggestive of muscle tension dysphonia, likely learned as a result of [the Plaintiff] straining to maintain speech during dyspneic episodes as [the Plaintiff] runs out of breath during phonation." R. 534.

On August 8, 2012, the Plaintiff was evaluated by Gauri Pawar, MD, and Naga Sirikonda, MD. R. 527-32. Dr. Sirikonda assessed that the Plaintiff had "[d]yspnea on exertion with severe obstructive ventilatory defect on pulmonary function tests," "[o]bstructive sleep apnea," "muscle tension dysphonia," and "essential tremors." R. 528. Dr. Pawar found that the Plaintiff had

7

"[t]remors of the outstrected arms" and was "[n]ot a good candidate for Propranolol nor benzodiazepines since he has breathing issues." R. 531-32.

On August 16, 2014, Dr. Hickman wrote a letter to Plaintiff's counsel in response to counsel's request for an opinion regarding the Plaintiff's medical condition. R. 539. Dr. Hickman stated that the Plaintiff "has been found to have severe obstructive ventilatory defects on pulmonary function testing" and "is also having progressively worsening pain and stiffness of most joints, primarily his knees, low back and wrists." *Id.* "Due to a lack of diagnosis," Dr. Hickman wrote that the Plaintiff's "prognosis could be quite poor." *Id.* Dr. Hickman believed that the Plaintiff "is very limited in jobs that he could perform due to his breathing problems and resultant dysphonia, as well as, continued pain." *Id.*

**C. Testimonial Evidence**

Testimony was taken at a hearing held on August 17, 2012. R. 73. The following portions of the testimony are relevant to the disposition of this case.

The Plaintiff testified that he is unable to work because of his difficulty breathing and tremors. R. 79. Further, Plaintiff testified that he cannot stand or sit for long durations. *Id.* For breathing, the Plaintiff uses an inhaler, and sometimes undergoes nebulizer treatments. *Id.* The Plaintiff testified that his breathing has "gotten a little worse" since January 2011 and pain in his joints have spread and increased. R. 80. Plaintiff testified that every time he straightens his arms, he experiences tremors. *Id.*

The Plaintiff testified that his wife does most of the chores, however, he will prepare dishes to wash and set. R. 82. The Plaintiff testified that he last hunted a year and a half before the August 17, 2012, hearing. R. 83. For recreation, the Plaintiff will do "[s]ome" fishing. *Id.*

8

A VE also testified at the hearing. *Id.* The VE testified that the Plaintiff's past work classified at various times as medium and unskilled, heavy and skilled, heavy and unskilled, and heavy and semi-skilled. R. 86. Next, the ALJ posed the following hypothetical to the VE:

> All right, then let me ask you to assume a hypothetical individual of the claimant's age, educational background and work history who could perform a range of light work, could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds to the maximum extent possible, should walk on level and even surfaces. The work should consist primarily of gross manipulation. The person should not be exposed to temperature extremes, whether humid conditions, environmental pollutants or hazards. Would there by any work in the regional or national economy that such a person could perform?

*Id.* The VE testified that there would be work in the economy, and provided three occupational examples. R. 86-87. Next, the ALJ added an additional hypothetical:

> And if you would add to the hypothetical that the person would require a sit/stand option with the ability to sit, stand and walk for a least 15 minutes each at a time, does that, any of the jobs you've named accommodate that, or would any, or would there be other jobs that work?

R. 87. The VE testified that the three examples previously provided would still be appropriate. *Id.*

### III. ALJ FINDINGS

In determining whether Plaintiff was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since February 22, 2011, the alleged onset date of Plaintiff's disability. R. 60. At step two, the ALJ found that the Plaintiff has the following severe impairments: severe obstructive and restrictive lung disease, old nonunion styloid fracture of the right wrist, spur formation of the bilateral elbows/chronic left tennis elbow, diagnosis of essential/intentional tremors, and obesity. R. 61. At the third step, the ALJ found that none of the

9

Plaintiff's impairments or combination of impairments meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Supart P, Appendix 1. *Id*. Before considering step four of the sequential evaluation process, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform a range of work activity that:

> requires no more than a light level of physical exertion; affords a sit/stand option without breaking task, with the person having the ability to sit, stand and walk for at least 15 minutes at a time each; requires no climbing of ladders, ropes or scaffolds, or more than occasional balancing, climbing ramps/stairs, walking on level, even surfaces; work should consist primarily of gross manipulation; and avoid exposure to temperature extremes, wet or humid conditions, environmental pollutants or hazards . . . .

R. 62. At step four, the ALJ found that the Plaintiff is unable to perform any past relevant work. R. 65. At the final step, the ALJ found that considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform. R. 66.

## IV. MOTIONS FOR SUMMARY JUDGEMENT

### A. Contentions of the Parties

Plaintiff contends that the ALJ's unfavorable decision is based on legal error and not supported by substantial evidence. Specifically, he argues (1) the ALJ's finding that the Plaintiff's voice loss was not a severe impairment is not supported by the evidence of the record, and (2) the ALJ's RFC including "work should consist primarily of gross manipulation" is unclear and the ALJ did not assess the maximum remaining ability to do work-related activities that include fine or gross manipulation

Defendant argues that the ALJ's decision is supported by substantial evidence and should be affirmed as a matter of law. Specifically, the Commissioner contends that (1) substantial evidence

supports the ALJ's determination that the Plaintiff had not proven that his chronic voice issues eroded his occupational base for the range or work that his RFC defined, and (2) substantial evidence supports that ALJ's determination that the Plaintiff could perform a wide range of light work that consisted primarily of gross manipulation.

**B. The Standards**

1. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

2. Judicial Review

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

3. Social Security - Claimant's Credibility

"Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)). "We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

**C. Discussion**

1. The ALJ's Consideration of the Plaintiff's Voice Loss

The Plaintiff argues that the ALJ failed to assess whether the Plaintiff's voice loss significantly limited his ability to do basic work activities. Further, the Plaintiff contends that the ALJ did not provide a sufficient rationale for his conclusion or consider the opinion of the Plaintiff's primary care physician concerning the Plaintiff's voice loss.

At the second step of the five-step sequential evaluation process, the ALJ will "consider the medical severity of [the Plaintiff's] impairment(s)." 20 C.F.R. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii). Under the Code of Federal Regulations, a Plaintiff's severe impairment is "any impairment or combination of impairments which significantly limits [the Plaintiff's] physical or mental ability to do basic work activities . . . ."§§ 404.1520(c), 416.920(c).

All medical opinions are to be considered in determining disability status. 20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. §§ 404.1527(c), 416.927(c). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Id.* (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. *Evans v. Heckler*, 734 F.2d 1012, 1015 (4th Cir. 1984). Ultimately, the Commissioner is "responsible for making the determination or decision about whether [the Plaintiff] meet['s] the statutory definition of disability." §§ 404.1527(d)(1), 416.927(d)(1).

Contrary to the Plaintiff's contentions, the ALJ did provide a rationalization for his determination that the Plaintiff's "voice issues" were "nonsevere" and did discuss the opinion of the Plaintiff's primary care physician. R. 61-65. At the second step, the ALJ found that the Plaintiff's

voice loss was a nonsevere impairment "not causing more than minimal limitation in the [Plaintiff's] ability to perform work activity . . . ." R. 61. The ALJ noted that, during the hearing, "the undersigned did not observe any voice problems at the hearing." R. 61.

The ALJ further discussed the Plaintiff's allegations of voice loss and the opinion of the Plaintiff's primary physician in reaching the Plaintiff's RFC determination. R. 61-65. The ALJ afforded great weight to Dr. Byrd, who reported that the Plaintiff "needs to avoid respiratory exposures." As such, the ALJ included this limitation in the RFC. R. 65. However, the ALJ found, concerning the Plaintiff's breathing issues, "imaging shows no significant thoracic cage abnormality and unremarkable chest x-rays." R. 63. Further, the Plaintiff's "breathing has been reported a stable, and examinations have shown that his lungs are clear . . . he is not experiencing dyspnea, and his breathing is non-labored." R.63-64. Furthermore, the ALJ concluded that the Plaintiff's respiratory issues are "stable." *Id.*

In addressing the opinion of the Plaintiff's primary care physician, the ALJ provided "little weight" to the opinion of Dr. Hickman in her letter to the Plaintiff's counsel. In Dr. Hickman's letter, the opined that the Plaintiff "is very limited in jobs . . . that require[] much speaking when he has his laryngitis flares." R. 539. In providing little weight to this opinion, the ALJ explained that Dr. Hickman's letter was "vague" and "not quantifiable in any relative terms" and "Dr. Hickman does not provide any objective evidence, such as a physical assessment, to quantitiate her opinion . . . ." R. 65. Based on "[t]hese facts," the ALJ found that Dr. Hickman's opinion was "less persuasive than the opinions of the state agency medical consultants." R. 65. As such, substantial evidence is satisfied under this claim.

2. The ALJ's RFC Determination

The Plaintiff argues that the ALJ failed to properly assess the Plaintiff's upper extremity impairments in creating the RFC. The Plaintiff contends that his limitation concerning fine and gross manipulation is essential in his ability to work. Consequently, the ALJ's RFC requiring work consisting "primarily of gross manipulation" is unclear and ignores the limitations of work the Plaintiff can perform. R. 62. Essentially, the Plaintiff's primary argument is that the ALJ's RFC requiring that the Plaintiff's work "should consist primarily of gross manipulation" is improperly vague.

A RFC is what the Plaintiff can still do despite his limitations and an assessment based upon all of the relevant evidence. 20 C.F.R. §§ 404.1545, 416.945. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of the Plaintiff's medical condition. *Id.* Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of the Plaintiff's limitations may be used. *Id.* These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps the Plaintiff from performing particular work activities. *Id.* This assessment is not a decision on whether the Plaintiff is disabled, but is used as the basis for determining the particular types of work the Plaintiff may be able to do despite his impairments. *Id.* The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946.

Here, the ALJ determined that Plaintiff has the RFC to perform a range of work activity that

> requires no more than a light level of physical exertion; affords a sit/stand option without breaking task, with the person having the ability to sit, stand and walk for at least 15 minutes at a time each; requires no climbing of ladders, ropes or scaffolds, or more than occasional balancing, climbing ramps/stairs, walking on level, even

> surfaces; *work should consist primarily of gross manipulation*; and avoid exposure to temperature extremes, wet or humid conditions, environmental pollutants or hazards . . . .

R. 62 (emphasis added). During the ALJ hearing, the ALJ proposed a hypothetical to the VE, asking the VE

> to assume a hypothetical individual of the claimant's age, educational background and work history who could perform a range of light work, could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds to the maximum extent possible, should walk on level and even surfaces. *The work should consist primarily of gross manipulation*. The person should not be exposed to temperature extremes, whether humid conditions, environmental pollutants or hazards. Would there by any work in the regional or national economy that such a person could perform?

R. 86 (emphasis added). In answering the ALJ's hypothetical, the VE cited three jobs that existed in the economy. R. 86. Furthermore, the VE testified that, with the exception of a sit/stand option, nothing in the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). R. 87. In both the hypothetical and the RFC, the ALJ used the phrase, "should consist primarily of gross manipulation." R. 62, 86. Therefore, the ALJ's RFC determination includes all limitations that he found to be supported by the record and validated by the VE's opinion. Further, at no point during the hearing did the VE express confusion about the hypothetical.

Even if the occupations cited by the VE include some work beyond gross manipulation, the RFC would still be adequate because, as stated in the RFC, the "work should consist *primarily* of gross manipulation." R. 62 (emphasis added). The ALJ did not claim that the Plaintiff could *only* perform work that required *solely* gross manipulation. Furthermore, the ALJ cites examples in the record that suggest that the Plaintiff can perform "fine" work. The ALJ noted that the Plaintiff

16

testified that the he "continues to fish by sitting in a chair at the lake." R. 63, 83. In order to fish, the ALJ reasoned that the Plaintiff "would need to use his hands to do 'fine' work as he would need to tie on hooks or lures, grasp and handle the pole to case, and grasp and turn the reel." *Id.* Additionally, the ALJ addressed that after a physical examination with a rheumatologist, the "objective evidence . . . does not show any limitation in reaching, handling, grasping, or manipulating . . . ." R. 64, 463-82. Thus, based on the record, substantial evidence supports the ALJ's RFC.

## V. RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1. The Plaintiff's Motion for Summary Judgment be **DENIED**. ECF No. 14.

2. The Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth. ECF No. 16.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727

F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: January 7, 2015 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE